**KIMBERLY C. LAU**(*pro hac vice* **pending)**
**GRANT R. CORNEHLS (GC-6123)**
**JAMES E. FIGLIOZZI (***pro hac vice* **pending)**
**WARSHAW BURSTEIN, LLP**
**575 Lexington Avenue**
**New York, New York 10022**
**(212) 984-7700**
*Attorneys for Plaintiff John Doe*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JOHN DOE,**<br><br>                    **Plaintiff,**<br>      **v.**<br><br>**RUTGERS, THE STATE UNIVERSITY**<br>**OF NEW JERSEY,**<br>                    **Defendant.** | **Civil Action No.:**<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

PLAINTIFF JOHN DOE[1], by his attorneys Warshaw Burstein, LLP, as and for his Complaint against Defendant RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, ("Rutgers" or "Defendant"), respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.       This Title IX discrimination lawsuit is brought on behalf of Plaintiff John Doe ("John" or "Plaintiff"), a former student at Rutgers.

2.       John was a sophomore student at Rutgers when he was suspended over allegations that he stalked and committed dating violence against his ex-girlfriend, Jane Roe.[2]

---

[1] Plaintiff has filed a simultaneous Motion to Proceed Pseudonymously.
[2] "Jane Roe" is a pseudonym. Plaintiff will identify students by pseudonyms to protect their confidentiality. Rutgers knows the identity of all of the students so identified.

3.     Motived by anti-male gender bias, Rutgers selectively enforced its disciplinary policies against John, a male student, and failed to do so in equal fashion against Jane, a female student, in violation of Title IX of the Education Amendments of 1972.

4.     Rutgers also reached an incorrect outcome when it found John responsible for multiple violations of Rutgers' policies after a flawed disciplinary process that was rife with anti-male gender bias.

5.     John has been greatly damaged by Rutgers' actions: his education and future career as an actor have been severely compromised due to his disciplinary record.

6.     Additionally, as a result of Rutgers' actions and inactions, John has suffered reputational damages; economic injuries; and the loss of other educational and career opportunities.

## THE PARTIES

7.     John Doe is a natural person residing in New York.

8.     Rutgers is a public land-grant research university duly organized and existing by virtue of the laws of the State of New Jersey that conducts business in the State of New Jersey.

## JURISDICTION AND VENUE

9.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims herein arise under federal law.

10.     This Court has personal jurisdiction over Defendant because Defendant is a resident of the State of New Jersey and conducts business within the State of New Jersey.

11.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

12.     John Doe is a former student at Rutgers University.

13.     Jane Roe is a current student at Rutgers University.

14.     John and Jane were both students enrolled in the Rutgers University Mason Gross School of the Arts ("Mason Gross") during the 2021-2022 and 2022-2023 academic years.

**A.     The Rutgers Title IX Policy**

15.     During the time that John and Jane were enrolled, Rutgers had a Title IX policy in place (the "Rutgers Title IX Policy").

16.     According to the Rutgers Title IX Policy, Rutgers uses the preponderance of the evidence standard in determining whether a violation has occurred.

17.     The Rutgers Title IX Policy also states, "Rutgers, and not the Parties, has the burden of proof and burden of gathering evidence.  Rutgers is responsible for proving a violation of this Policy has occurred."

18.     The Rutgers Title IX Policy includes several definitions of behavior that it considers "Covered Sexual Harassment."

19.     "Stalking" is considered "Covered Sexual Harassment" by the Rutgers Title IX Policy.

20.     The Rutgers Title IX Policy defines "Stalking" as follows:

Stalking (as defined in the VAWA amendments to the Clery Act), meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to: (A) fear for their safety or the safety of others; or (B) suffer substantial emotional distress.

21.     The Rutgers Title IX Policy contains the relevant definitions from the Clery Act referenced above.

22.     As stated in the Rutgers Title IX Policy, a "course of conduct" means two or more

acts, including, but not limited to, acts which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, communicates to or about, a person.

23.     The Rutgers Title IX Policy notes that "reasonable person" means "a reasonable person under similar circumstances and with similar identities to the victim."

24.     As defined by the Rutgers Title IX Policy, "substantial emotional distress" means "significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling."

25.     "Dating Violence" is also considered "Covered Sexual Harassment" by the Rutgers Title IX Policy.

26.     The Rutgers Title IX Policy defines "Dating Violence" as follows:

Dating violence (as defined in the Violence Against Women Act ("VAWA") amendments to the Clery Act), which includes any violence committed by a person: (A) who is or has been in a social relationship of a romantic or intimate nature with the victim; and (B) where the existence of such a relationship shall be determined based on a consideration of the following factors: (i) the length of the relationship; (ii) the type of relationship; (iii) the frequency of interaction between the persons involved in the relationship.

27.     According to the Rutgers Title IX Policy, "all University employees who are not designated as Confidential Resources are required to notify a Title IX Coordinator upon receipt of a report of alleged Covered Sexual Harassment from a student."

28.     The Rutgers Title IX Policy also notes, "Any University employee (other than the confidential resources identified in Appendices A and B) who receives a report about conduct prohibited by this Policy involving a student is required to inform the appropriate Title IX Coordinator about the incident."

29.     According to Appendices A and B of the Rutgers Title IX Policy, the following individuals and entities are considered Confidential Resources on the New Brunswick campus:

•     Office for Violence Prevention and Victim Assistance (VPVA)

- Rutgers Student Health – Counseling, Alcohol & Other Drug Assistance Program and Psychiatric Services (CAPS)

- Rutgers Student Health Services – Physicians and other Health Professionals

- University Chaplains (or Ordained Clergy)

- Student Legal Services

30.    Faculty members and academic advisors are not considered Confidential Resources according to the Rutgers Title IX Policy.

**B.    John and Jane's Relationship**

31.    John and Jane were involved in a non-exclusive sexual relationship from August 2021 to November 2021.

32.    From November 2021 to January 2022, John and Jane were in an exclusive dating relationship.

33.    In January 2022, John told Jane that he wanted to take a break from dating exclusively, and their relationship reverted to a non-exclusive sexual relationship, which ended in May 2022.

34.    As part of their romantic relationship, John and Jane engaged in unconventional sexual practices.

35.    Of particular relevance is an encounter that occurred between Jane and John in December 2021.

36.    While John and Jane were walking down a hallway in John's dorm, Jane began joking about knocking on John's resident assistant's door.

37.    John told her not to do so, but Jane kept pushing and saying she was going to do it anyway.

38.     John responded by playfully placing his hand on Jane's neck and telling her to go to his dorm room.

39.     Throughout their relationship, this was a romantic gesture that served as a prelude to sexual activity.

40.     The December 2021 incident was no different.

41.     After John placed his hand on Jane's neck and told her to go to his room, she did so, and they engaged in consensual sexual activity.

42.     In the immediate aftermath of this encounter, Jane made no indication that any behavior by John was non-consensual.

43.     Jane never told John that the placement of his hand on her neck was unwelcome.

44.     She also did not make any complaint or report to the Rutgers Title IX office in the immediate aftermath of this consensual encounter.

45.     At the end of the Spring 2022 semester, John and Jane parted amicably and intended to remain friends over the summer.

46.     In fact, John and Jane went on a date towards the end of the Spring 2022 semester before they went home for the summer break.

47.     John and Jane were also assigned a scene to be performed in September of 2022 that they were expected to rehearse over the summer.

48.     Jane unexpectedly and unilaterally ended the relationship during the summer of 2022 when she blocked John on social media without any warning or explanation.

**C.     Jane's False Accusations and Rutgers' Response**

49.     After she blocked John, Jane began spreading false rumors about John related to their previous romantic relationship.

50.     Specifically, Jane falsely claimed that John sexually assaulted her and otherwise abused and harassed her during their relationship.

51.     Jane started spreading false rumors during the summer of 2022 and continued doing so throughout the 2022-2023 academic year.

52.     Jane falsely told other Rutgers students that John sexually assaulted her and otherwise abused and harassed her during their relationship.

53.     Jane also falsely told Rutgers faculty members that John sexually assaulted her and otherwise abused and harassed her during their relationship.

54.     During their freshman year, John and Jane took a course with Rutgers Professor Deb Jackel.

55.     During the Fall 2022 semester, John and Jane were taking multiple courses together.

56.     During the Fall 2022 semester, John and Jane were both taking courses taught by Rutgers faculty members Cameron Knight and Danielle Liccardo-Masood.

57.     Jane falsely told Knight that John sexually assaulted her and otherwise abused and harassed her during their relationship.

58.     Jane falsely told Jackel that John sexually assaulted her and otherwise abused and harassed her during their relationship.

59.     Jane falsely told Liccardo-Masood that John sexually assaulted her and otherwise abused and harassed her during their relationship.

60.     On September 16, 2022, John informed Jackel that Jane was spreading false rumors about him.

61.     On September 19, 2022, John informed Knight that Jane was spreading false

rumors about him.

62. While Knight directed his class to stop the "shit-talking" about John, he did not take any steps to bring Jane's behavior to the attention of the Rutgers Title IX office and instead encouraged students to make complaints against John if needed.

63. Jackel similarly failed to report Jane's actions to the Title IX office.

64. Knowing that there would be no consequences for her actions, Jane continued her harassment campaign against John.

65. Jane's behavior was supported and encouraged by multiple Rutgers professors.

66. On September 25, 2022, Liccardo-Masood falsely accused John of engaging in unwanted and inappropriate touching, being disruptive and intimidating, making unwanted advances towards students, and using abusive language.

67. Liccardo-Masood's fabricated complaint against John was based on the false statements that Jane made to her about John and that Jane was spreading to other faculty members and students at Rutgers.

68. The shock of being falsely accused of such horrible acts led John to take a brief leave of absence from his program.

69. Rutgers inexplicably waited until October 14, 2022 to tell John that Liccardo-Masood – a Rutgers professor whose class he was enrolled in – filed the September 25, 2022 complaint against him.

70. John planned to return to classes on October 17, 2022.

71. On October 16, 2022, Knight sent an email to a limited number of students in his class, including Jane, informing them that John would be returning to class on October 17, 2022.

72. Knight's email directed Jane and the other students to Rutgers resources that could

be used if they needed "additional support" in dealing with John's return to class.

73.     Knight's email indicated that he believed that John was guilty of the accusations Jane levied against him.

74.     Knight also enacted a policy that students who refused to attend class on October 17, 2022 due to John's return would not be marked absent.

75.     This attendance policy further indicated that Knight believed that John was guilty of the accusations Jane levied against him.

76.     Knight's October 16, 2022 email and attendance policy were based on the false statements about John that Jane had made to him.

77.     Even though she knew that Knight's email was directed at a limited number of students in the class, Jane disseminated the email to the entire class except for John in a group Snapchat thread on October 16, 2022.

78.     In response, members of the class threatened to physically harm John, contacted the Rutgers University Police Department to request campus security present near John's classes in an attempt to intimidate him, and encouraged each other to send emails to Rutgers administrators protesting John's return.

79.     All of this occurred in writing in a Snapchat group message thread.

80.     The students held a Zoom meeting on the evening of October 16, 2022.

81.     The purpose of the Zoom meeting was to discuss how to prevent John from continuing his education at Rutgers.

82.     On both the Snapchat message thread and the Zoom call, Jane encouraged the conduct of the other students that would undoubtedly harm John.

83.     The animosity and planned harm directed at John on the Snapchat thread and the

Zoom call were based on the false statements that Jane made about John.

84.     Knight was aware of the existence of Jane's improper circulation of his email, the Snapchat message thread, the Zoom meeting, and the various threats and retaliatory behavior planned against John.

85.     Instead of reprimanding the students and reporting these issues to the Rutgers Title IX office, Knight was angry that the Snapchat message thread was shared with John.

86.     On October 17, 2022, Knight publicly accused one of John's friends of leaking the Snapchat message thread to John.

87.     As a result of Knight's bullying, John's friend ended up transferring to another program at Rutgers not affiliated with Mason Gross.

88.     John and his parents had a meeting with Knight, Ellen Bredehoft, and Christine Whalen on October 17, 2022 to discuss Jane's conduct, the threats levied against John, and the retaliatory behavior planned by his fellow students as a result of Jane's conduct.

89.     During this meeting Bredehoft, the Chair of the Rutgers Theater Department, urged John to take a leave of absence from Rutgers because it was "not safe" for John to be at the school due to the threats of physical violence he was facing as a result of Jane's false rumors.

90.     Even though she explicitly acknowledged that Jane's actions were putting John in danger, Bredehoft never reported Jane's behavior to the Title IX office.

91.     Whalen, a Rutgers Academic Advisor and Student Success Counselor, also failed to make any report to the Rutgers Title IX office.

92.     As part of a prior Resolution Agreement with the United States Department of Education's Office for Civil Rights ("OCR") in March of 2017, Rutgers represented that it provided "training to all University staff responsible for recognizing and reporting incidents of sex

discrimination and harassment, and staff with Title IX compliance and implementation responsibilities, including Title IX coordinators and designees" in the Fall of 2016.

93.     As part of that Resolution Agreement, Rutgers also stated that it would provide this training to all new Rutgers employees when they are hired.

94.     Rutgers represented that the training provided to all new hires would include a review of "the grievance procedures; how to recognize and appropriately address allegations and complaints pursuant to Title IX; identifying sex discrimination and sexual harassment, including sexual assault and sexual violence; the University's responsibilities under Title IX to address such allegations; and the relevant resources available."

95.     Pursuant to the terms of the Resolution Agreement, Rutgers was also required to "provide copies of nondiscrimination notices and Title IX grievance procedures to all attendees or refer them to the location where posted."

96.     Jackel joined the Rutgers faculty at the start of the 2022-2023 academic year.

97.     Prior to being named a faculty member at Rutgers, Jackel had served as an adjunct professor at Mason Gross for several years.

98. On August 3, 2021, Jackel posted the following on Facebook:



99.   Jackel's statement – "Believe Women.  Period." – advocates for the acceptance of women's allegations of sexual harassment or sexual assault at face value without question.

100.   Jackel's statement also presupposes the guilt of any man accused of sexual harassment or sexual assault when he is accused by a woman.

101.   Jackel's statement shows that she has an inherent bias against men like John who are merely accused of sexual misconduct by women.

102.   Marshall Jones III – Rutgers' Associate Dean for Equity, Head of the Rutgers BA Theater program since 2002, Director of the Rutgers Community Arts Summer Acting Conservatory, and 2020 inductee into the Rutgers University African American Hall of Fame – commented on Jackel's Facebook post.

103.   Jones responded, "Absolutely," indicating that he endorsed Jackel's biased, anti-male belief that women who accuse men of sexual misconduct must be believed no matter what.

104.   Knight began working as director of the Mason Gross School's BFA acting program at the start of the 2021-2022 academic year.

105.   Whalen has been an instructor at Rutgers since 2014.

106.   Bredehoft has been teaching at Rutgers since 2010.

107.   Based on the March 2017 Resolution Agreement between Rutgers and OCR, Bredehoft, Whalen, Knight, and Jackel should have received training related to the Rutgers Title IX Policy as well as a copy of the Rutgers Title IX Policy or directions on where to find it.

108.   Accordingly, Bredehoft, Whalen, Knight, and Jackel were all aware that they were obligated to report Jane's misconduct to the Title IX Coordinator.

109.   Despite being aware of this obligation, Bredehoft, Whalen, Knight, and Jackel all failed to report Jane's misconduct to the Title IX Coordinator.

110. On October 18, 2022, Knight told his class that he would make sure that John never gained admission to another undergraduate acting program.

111. Also on October 18, 2022, Liccardo-Masood informed her students that she would support any decision by her students to boycott attending her class while John was enrolled in the class.

112. Liccardo-Masood engaged in this threatening and retaliatory behavior based on the false statements that Jane made about John.

113. On October 18, 2022, one of John and Jane's male classmates filed a Title IX complaint against John echoing Jane's false claim that John had followed her.

114. This complaint was based on the false statements that Jane made about John.

115. On October 18, 2022, one of John's female classmates sought a no-contact order against John.

116. Rutgers issued this requested no-contact order with no explanation or notice.

117. This no-contact order was sought and granted based on Jane's false statements about John.

118. Knight also directed other Rutgers professors to cancel in-person classes based on Jane's false allegations based on Jane's false statements about John.

119. In response to Knight's directive, Christopher Cartmill, the Head of Dramaturgy at Mason Gross, temporarily moved his Global Theater course to Zoom as a result of Jane's false allegations against John.

120. During the Fall 2022 semester, John and Jane were both enrolled in Cartmill's Global Theater course.

121. On October 20, 2022, Cartmill sent a message to the Global Theater Course stating

that he was moving upcoming classes to Zoom because "[t]hese have been difficult days," a clear reference to Jane's false claims against John.

122.    In his October 20, 2022 message, Cartmill further stated, "I understand the disruption of this moment.  I feel it myself.  There are times when it can't be helped, though we do ourselves a disservice, even harm, when we let circumstances beyond our control live rent-free in our heads and keep us from the path we have committed to follow.  I'm writing to myself as much as you."

123.    Like the previous communications disseminated by Knight and Liccardo-Masood, Cartmill's message assumed that John was guilty of the conduct falsely alleged by Jane before any sort of investigation was conducted.

124.    As described above, Jane's actions constituted "Stalking" as defined by Rutgers' Title IX Policy.

125.    On multiple occasions, Jane directly communicated false statements about John to Rutgers students and faculty members.

126.    As a result of Jane's actions, John was subjected to threats of physical harm, public shunning, and the filing of false complaints against him by Rutgers faculty and other Rutgers students.

127.    As a result of Jane's actions, John's educational and professional future was also put in jeopardy.

128.    Specifically, Knight stated his clear intention to ruin John's educational and professional future when he told multiple Rutgers students that he would leverage his educational and industry connections to make sure that John could never enroll in another undergraduate acting program.

129.    Jane's false statements were the basis of Knight's wholly improper threat to destroy John's educational and professional future.

130.    Any reasonable person under these circumstances would fear for his safety and suffer substantial emotional distress.

131.    In fact, Rutgers – through Bredehoft – admitted to John that the Rutgers campus was "not safe" for him as a result of Jane's actions.

132.    At the same time John's allegations against Jane were being ignored, Rutgers was actively encouraging Jane to file a Title IX claim against John.

133.    On October 17, 2022, the Rutgers Title IX office sent an email to Jane asking her if she wanted to file a Title IX complaint against John.

134.    On October 20, 2022, Rutgers' Title IX Coordinator, Jackie Moran, filed a Title IX complaint against John on Jane's behalf.

135.    Moran filed the Title IX complaint because Jane explicitly stated that she did not want to initiate the Title IX process.

**D.    The Flawed Title IX Investigation**

136.    Despite Jane's clearly stated refusal to file a Title IX complaint against John, Rutgers launched a full-scale investigation against John at Moran's behest.

137.    On October 27, 2022, Rutgers sent a Notice of Allegations to John and Jane *via* email.

138.    On October 27, 2022, Amy Miele, then Associate Director for Student Affairs Compliance & Title IX, conducted an intake meeting with John.

139.    On November 4, 2022, Rutgers Title IX Investigators Bill Spear and Donald Moore interviewed Jane.

140.    On November 9, 2022, Spear and Moore interviewed Jane for a second time.

141.    On November 18, 2022, Spear and Moore interviewed Jane for a third time.

142.    On November 28, 2022, Spear sent John and Jane an updated Notice of Allegations based on the three interviews he and Moore had conducted with Jane.

143.    On December 2, 2022, Spear conducted an interview with Witness 1, an individual identified by Jane.

144.    Prior to her interview with Spear, Witness 1 had received the October 2022 communications sent by Knight, Liccardo-Masood, and Cartmill that improperly assumed John's guilt.

145.    On December 7, 2022, Spear and Moore conducted an interview with John.

146.    On December 15, 2022, Spear and Moore conducted an interview with Witness 4, an individual identified by Jane.

147.    Prior to her interview with Spear and Moore, Witness 4 had received the October 2022 communications sent by Knight, Liccardo-Masood, and Cartmill that improperly assumed John's guilt.

148.    On December 16, 2022, Spear and Moore conducted a second interview with John.

149.    During the December 16, 2022 interview, John told Spear and Moore that Jane physically assaulted him at a party on September 11, 2021.

150.    As the Lead Investigator and an Investigator in Rutgers' Title IX Office, respectively, Spear and Moore knew or should have known that the Rutgers Title IX Policy required them to report Jane's behavior, which clearly constituted Dating Violence, to the Title IX Coordinator, even if John did not wish to file a formal complaint.

151.    In violation of the Rutgers Title IX Policy, Spear did not report this instance of

Dating Violence by Jane to the Rutgers Title IX Coordinator.

152.    Moore also failed to report this instance of Dating Violence by Jane to the Rutgers Title IX Coordinator in violation of the Rutgers Title IX Policy.

153.    On January 24, 2023, Spear conducted an interview with Witness 5, John's roommate who was identified as a witness by Rutgers.

154.    The Final Investigation Report was issued on March 15, 2023.

155.    The Final Investigation Report characterized John and Jane's interaction in January of 2022 as "the January 2022 stalking incident."

156.    This characterization indicated that Rutgers improperly determined that John committed a violation of the Title IX Policy at the investigation stage before the Title IX hearing was conducted.

157.    John was ultimately charged with Dating Violence, Domestic Violence, and Stalking under the Title IX Policy.

158.    He was also charged with Non-Title IX Relationship Violence and Non-Title IX Stalking under the Rutgers Student Code of Conduct.

**E.    The Flawed Title IX Hearing And Adjudication Process**

159.    Tricia B. O'Reilly, a partner at Walsh Pizzi O'Reilly Falanga LLP ("Walsh Pizzi"), was hired by Rutgers to serve as the decision-maker for John's Title IX case.

160.    In her role as decision-maker, O'Reilly presided over the live hearing that was conducted on April 5, 2023.

161.    In 2019, O'Reilly served as counsel for Rutgers in a matter filed in the District of New Jersey.

162.    O'Reilly was previously associated with Connell Foley LLP ("Connell Foley").

163.    Connell Foley has a long-standing relationship as legal counsel for Rutgers.

164.    Walsh Pizzi's Chambers and Partners profile, which indicates that all information was provided by Walsh Pizzi, lists Rutgers as one of the "Key Clients" of one of O'Reilly's current partners at Walsh Pizzi.

165.    O'Reilly's prior representation of Rutgers constituted a potential or actual conflict of interest.

166.    O'Reilly's association with two well-known New Jersey law firms that have provided decades of legal representation to Rutgers, up to and including the time she was serving as the decision-maker in John's Title IX case, constituted a potential or actual conflict of interest.

167.    According to Rutgers' Title IX Policy, Rutgers' employees involved in the Title IX process, including Title IX coordinators, investigators, and appeals officers, have a duty to disclose any potential or actual conflicts of interest.

168.    No one at Rutgers ever disclosed the potential or actual conflicts of interest inherent in Ms. O'Reilly's role as the decision-maker to John.

169.    According to Rutgers' Title IX Policy, the Title IX decision-maker has a duty to disclose any potential or actual conflicts of interest.

170.    O'Reilly never disclosed the potential or actual conflicts of interest inherent in her acting as the decision-maker to John.

171.    During the hearing, two witnesses identified by Jane – Witness 2 and Witness 4 – provided testimony.

172.    Prior to providing testimony at the Title IX hearing, Witness 2 had received the October 2022 communications sent by Knight, Liccardo-Masood, and Cartmill that improperly assumed John's guilt.

18

173.    Prior to providing testimony at the Title IX hearing, Witness 4 had received the October 2022 communications sent by Knight, Liccardo-Masood, and Cartmill that improperly assumed John's guilt.

174.    O'Reilly made numerous improper rulings against John during the Title IX hearing.

175.    O'Reilly barred John from presenting highly relevant evidence that would have impacted the credibility of Jane and one of her witnesses.

176.    Witness 2, one of Jane's friends who offered testimony at the hearing against John, pursued a relationship with John **after** Jane told her about the alleged behavior by John that led to the Title IX investigation.

177.    O'Reilly did not allow John to question Witness 2 as to why she decided to date John **after** Jane falsely told her that John had engaged in harassing behavior.

178.    O'Reilly improperly determined that this evidence was irrelevant.

179.    Witness 2's response to this line of questioning would have negatively impacted Jane's credibility, as it would have made no sense for Witness 2 to engage in a relationship with John if she actually believed Jane's false allegations.

180.    O'Reilly also barred John from introducing the fact that he ended the relationship with Witness 2.

181.    O'Reilly improperly determined that this evidence was not relevant.

182.    Permitting the introduction of this evidence would have negatively impacted Witness 2's credibility, as it would have shown that she was merely a jilted ex-girlfriend trying to get back at the person who broke up with her.

183.    O'Reilly made numerous improper rulings that favored Jane during the Title IX hearing.

184.    O'Reilly improperly permitted one of Jane's witnesses to expand on her live testimony by providing a supplemental written statement that was not subject to cross-examination.

185.    Additionally, O'Reilly inexplicably and improperly allowed Jane to introduce completely irrelevant evidence regarding John's mental health and medical history.

186.    Rutgers' Title IX Policy states that evidence and questions related to a Party's medical and psychological records are irrelevant unless the Party has given voluntary, written consent to be questioned on these issues.

187.    John never provided voluntary, written consent to be questioned about his mental health and medical history at the Title IX hearing.

188.    After the hearing concluded, O'Reilly permitted Witness 4 to provide a supplemental written statement regarding her testimony.

189.    John did not have the opportunity to cross-examine Witness 4 regarding her supplemental written statement.

190.    In a decision dated April 14, 2023, O'Reilly found John Responsible for Dating Violence and Stalking.

191.    O'Reilly found John responsible for Stalking based on three alleged incidents between John and Jane.

192.    The first incident involved an allegation that John attempted to eavesdrop on Jane and her friends in January 2022 while they were in Jane's dorm room and then subsequently exited the dorm at the same time as Jane in an attempt to encounter her.

193.    In finding that a preponderance of the evidence supported Jane's allegations regarding this first incident, O'Reilly ignored contradictions between Jane's version of events and

the testimony of a witness who supposedly corroborated Jane's account.

194.    O'Reilly also improperly determined that Jane reasonably feared for her safety because Jane's friends walked her to her car when she was leaving the campus and messaged her to drive when they observed John walking outside of the dorm toward the parking lot.

195.    However, O'Reilly specifically noted that Jane left her dorm and did not see John while she was walking to her car.

196.    John and Jane were engaged in a consensual sexual relationship from January 2022 to May 2022.

197.    O'Reilly's finding that Jane reasonably feared for her safety as a result of the January 2022 encounter is inconsistent with the undisputed fact that Jane continued to have a consensual sexual relationship with John for four months after the January 2022 encounter.

198.    Any finding that Jane suffered substantial emotional distress as a result of the January 2022 encounter would also be negated by Jane's decision to continue having sex with John for four months after the encounter.

199.    The second incident involved an allegation that John followed Jane from a group photoshoot onto a bus to the Rutgers library on September 14, 2022.

200.    In determining that Jane was more credible than John, O'Reilly noted that the fact that Jane had blocked him on social media should have made John aware that something was wrong.

201.    In making this determination, O'Reilly ignored the fact that Jane repeatedly contacted John after she blocked him on social media.

202.    When John and Jane returned to Rutgers in September of 2022, Jane informed John that he could earn his way back from being blocked on her social media.

203.    On September 5, 2022, Jane asked John for a tour of his apartment.

204.    On September 21, 2022, Jane asked John to borrow his ID to buy alcohol.

205.    O'Reilly also found John's statement that he did not think anything was wrong inconsistent with John asking if he could sit next to Jane on the bus.

206.    According to O'Reilly, extending this common courtesy meant that John had some concern that he was not welcome.

207.    O'Reilly admitted that Jane told John that he could sit next to her, but explained that the public setting of the bus, the fact that Jane kept her headphones in and did not speak with John during the trip, and Jane's decision to call her mother until John was out of her sight weighed in favor of accepting Jane's version of events and her "belief" that John was following her.

208.    Moreover, the fact that Jane asked John to borrow his ID to buy alcohol on September 21, 2022 incident contradicts O'Reilly's finding that Jane reasonably feared for her safety on September 14, 2022.

209.    Similarly, any finding that Jane suffered substantial emotional distress as a result of the September 14, 2022 encounter would be fatally flawed as a result of Jane's request to use John's ID to buy alcohol on September 14, 2022.

210.    The third incident involved an allegation that John followed Jane on a bus, back to their off-campus apartment building, and onto the elevator in the apartment building at the end of September 2022.

211.    O'Reilly stated that it was unclear whether this incident would be considered part of an "education program or activity," yet she still considered the incident to be within the scope of the Rutgers Title IX Policy.

212.    O'Reilly improperly found that alleged inconsistencies in John's statements

indicated that he was not merely going home but that he was actually following Jane and a male friend.

213.   Specifically, O'Reilly stated that John's statement that he felt anxiety upon seeing Jane was inconsistent with his choice to get on the same bus as her and her friend.

214.   However, O'Reilly also admitted that the fact that the next bus would not arrive for twenty-six minutes "may have been a legitimate reason for that choice."

215.   Still, O'Reilly improperly determined that John offered no explanation as to why he followed Jane and her friend into the building and chose to enter the elevator.

216.   As John explained, he was simply going home.

217.   Regardless, any finding that Jane reasonably feared for her safety as a result of this incident is contradicted by the undisputed fact that she was accompanied by a male friend at all times.

218.   Additionally, there was no evidence indicating that John behaved in a threatening manner that would cause a reasonable person to believe that he was planning on harming Jane.

219.   Jane's allegations of Dating Violence were based on the consensual encounter that occurred between Jane and John in December 2021.

220.   Specifically, Jane alleged that John placed his hand on her neck and squeezed and applied pressure to her neck, which caused her pain swallowing and talking the following day, without her consent.

221.   O'Reilly found Jane's claim that she did not consent to this behavior credible despite Jane's admission that she went to John's room after this encounter.

222.   Jane also conceded that it was likely that she engaged in sexual activity with John after they went to his room.

23

223.    O'Reilly found Jane's claim credible despite the undisputed fact that John and Jane remained in a consensual dating relationship until January 2022.

224.    O'Reilly found Jane's claim credible despite the undisputed fact that John and Jane were in a non-exclusive, consensual sexual relationship from January 2022 to May 2022 after their consensual dating relationship ended.

225.    O'Reilly also admitted that there were no third-party witnesses to what occurred in December 2021, nor was there any physical proof of the choking.

226.    O'Reilly further noted that Jane did not make a report regarding this incident to the Rutgers Title IX Office until September 27, 2022, approximately ten months after the alleged conduct took place.

227.    Despite all of these problems with Jane's narrative regarding the December 2021 encounter was not credible, O'Reilly improperly determined that Jane's account was more credible than John's.

228.    In finding John less credible than Jane, O'Reilly focused on non-existent inconsistencies in John's testimony while glossing over or completely ignoring the above-referenced inconsistencies in Jane's testimony.

229.    O'Reilly found that John's statement that he did not care if Jane knocked on his RA's door contradicted his directives to Jane not to knock on the door.

230.    However, O'Reilly had previously noted John's explanation for these supposedly contradictory statements – Jane was teasing John in a way that she previously used to initiate sexual activity.

231.    John's explanation is also noted in the Final Investigation Report.

232.    The Final Investigation Report specifically notes that John reported that Jane was

joking about knocking on the RA's door and "displayed a very specific set of mannerisms when she teased him in an attempt to initiate sexual activity."

233.   The Final Investigation Report further explained that John asserted that Jane had previously said something along the lines of "Or what?" or "What are you going to do about it?" when she sought to initiate sexual activity with John.

234.   Both the Final Investigation Report and O'Reilly's decision note that Jane said, "Or what?" or "What are you going to do about it?" in response to John's directives to not knock on his RA's door.

235.   John's explanation regarding Jane's previous behavior and her behavior immediately preceding the December 2021 encounter resolved any alleged contradiction between his statement that he did not care if Jane knocked on his RA's door and his directives for Jane not to do so.

236.   O'Reilly ignored John's explanation in order to improperly determine that he was not credible.

237.   O'Reilly noted that John's denial that he exerted pressure on Jane's neck while in the dorm hallway was inconsistent with his testimony that their sexual relations involved rough sex and violence, which O'Reilly incorrectly asserts John relied upon to justify his actions.

238.   O'Reilly noted earlier in her decision that John's statement that his relationship with Jane involved rough sex and violence was elicited from John on cross-examination by Jane's advisor.

239.   As noted by O'Reilly earlier in her decision, John said that he placed his hand on Jane's neck because Jane had previously expressed romantic interest in a "guy who was in control."

240.   In other words, John did not rely on the fact that his sexual relations with Jane

involved rough sex and violence to justify placing his hand on Jane's neck as O'Reilly falsely stated in reaching her flawed credibility determination.

241.    O'Reilly then asserted that John and Jane's history of rough sex and violence did not translate into consent by Jane to have John grip and squeeze her neck in an open hallway.

242.    This finding ignores the fact that John never claimed that he gripped and squeezed Jane's neck in a public hallway.

243.    Rather, John asserted that he simply placed his hand on Jane's neck.

244.    This finding also once again misconstrues John's justification for placing his hand on Jane's neck in the hallway.

245.    Indeed, O'Reilly's choice of words in her decision implicitly acknowledges that her interpretation of John's testimony strained credulity, as she noted that John "**<u>seemed</u>** to justify the interaction by pointing to [John and Jane's] alleged history of rough sex and violence."

246.    As explained above, John did not justify placing his hand on Jane's neck on their history of rough sex and violence.

247.    Rather, John stated that he placed his hand on Jane's neck because Jane had previously expressed romantic interest in a "guy who was in control."

248.    O'Reilly also relied upon Jane's admittedly unsupported statement given ten months after the encounter that she felt pain when she talked and swallowed the day after the encounter.

249.    O'Reilly further noted that she was persuaded to find Jane more credible than John regarding the December 2021 encounter because of John's supposed lack of credibility in describing a door-slamming incident that occurred during the 2022 Spring semester.

250.    The 2022 Spring semester door-slamming incident occurred several months after

26

the December 2021 encounter.

251.     The 2022 Spring semester door-slamming incident was entirely unrelated to the December 2021 encounter.

252.     John's behavior during the 2022 Spring semester door-slamming incident did not tend to make Jane's claim that he choked her in December 2021 more or less likely to be true.

253.     The 2022 Spring semester door-slamming incident did not form the basis of any finding of responsibility for any alleged violation of the Rutgers Title IX Policy.

254.     Thus, the 2022 Spring semester door-slamming incident did not make any allegation of Covered Sexual Harassment made by Jane more or less likely to be true.

255.     Accordingly, the door-slamming incident was not "Relevant" evidence as defined by the Rutgers Title IX Policy because it did not "tend to make an allegation of Covered Sexual Harassment more or less likely to be true."

256.     Despite the fact that the 2022 Spring semester door-slamming incident was irrelevant for the purposes of determining the nature of the December 2021 encounter between John and Jane, O'Reilly improperly utilized the 2022 Spring semester door-slamming incident to buttress her incorrect credibility determination regarding the December 2021 encounter in order to erroneously find John responsible for Dating Violence.

257.     Even if the 2022 Spring semester door-slamming incident were considered relevant evidence, it is clear that O'Reilly acted in a one-sided fashion favoring Jane by failing to apply the same standard to instances where she found that Jane's allegations against John were either false or unsubstantiated and, therefore, not credible.

258.     Despite identifying at least five instances outside of the December 2021 encounter where Jane's allegations against John were either false or could not be substantiated, O'Reilly did

not consider these instances to negatively impact Jane's credibility regarding the nature of the December 2021 encounter.

259.    O'Reilly found that Jane's allegation that John legitimately threatened to kill two of her male friends was not credible.

260.    O'Reilly found that Jane's allegation that John legitimately threatened to hit her or beat her up if she hit him was not credible.

261.    O'Reilly found that certain claims made by Jane about John's response to her blocking him on social media were not credible, specifically noting that there was "insufficient evidence to establish by a preponderance of the evidence that the interactions alleged by [Jane] occurred as [Jane] describes them."

262.    O'Reilly found that Jane's claim that John chased after her car as she was leaving the campus one day in January of 2022 was not credible because Jane's own testimony at the hearing established that she never even saw John as she was leaving the campus.

263.    O'Reilly found Jane's claims that John was not invited to a party that they both attended in 2022, that John only attended the party because he knew Jane would be there, and that John otherwise acted in a way that was threatening or inappropriate toward Jane at the party were not credible.

264.    O'Reilly did not reference any of these multiple instances where she found Jane's statements and claims not credible when discussing her credibility determination regarding the December 2021 encounter.

265.    O'Reilly also explicitly excluded Jane's decision to share Knight's email regarding John's return to class and the resulting threats of violence against and negative feelings about John within the acting cohort from her analysis of Jane's credibility.

266.    While she found John Not Responsible for Domestic Violence, O'Reilly still found that John engaged in violent behavior, but because it did not rise to the level of a felony or misdemeanor, it could not be considered Domestic Violence as defined by the Rutgers Title IX Policy.

267.    Additionally, although O'Reilly found John Not Responsible for Non-Title IX Relationship Violence and Non-Title IX Stalking, this was only because the Student Code of Conduct did not apply to John's alleged actions, which were wholly within the scope of the Rutgers Title IX Policy.

268.    O'Reilly specifically stated that she would have found John Responsible for Non-Title IX Relationship Violence and Non-Title IX Stalking if it were later determined that the allegations against John were found to be outside the scope of the Rutgers Title IX Policy.

269.    As a result of O'Reilly's findings, John was suspended from Rutgers for two years.

**F.    Rutgers' Flawed Handling Of John's Appeal**

270.    John submitted his appeal on April 21, 2023.

271.    The appeal cited the multiple procedural irregularities that favored Jane.

272.    The appeal also noted the multiple instances where O'Reilly minimized inconsistent and false statements made by Jane.

273.    The appeal further explained how O'Reilly mischaracterized the evidence and explanations that John provided in response to Jane's false allegations.

274.    The appeal detailed instances of improper bias against John.

275.    The appeal also noted that the sanction issued was disproportionate to the alleged conduct that John was found responsible for.

276.    Rutgers denied John's appeal on May 19, 2023 and affirmed John's two-year

suspension.

277.    The appeal decision was authored by Francesca Maresca, Rutgers' Assistant Vice Chancellor for Student Affairs – Health and Wellness.

278.    Maresca was personal friends with Amy Miele, the Director of the Title IX office and Title IX Coordinator at Rutgers – New Brunswick.

279.    On at least one occasion, Maresca commented on Miele's Facebook page, congratulating Miele on obtaining her Ph.D. from Rutgers.

280.    In light of her friendship with Miele, Maresca's role as the appellate officer in John's Title IX case constituted a potential or actual conflict of interest.

281.    In violation of the Rutgers Title IX Policy, Miele failed to disclose the potential or actual conflict of interest arising from her friendship with Maresca to John.

282.    In violation of the Title IX Policy, Maresca failed to disclose the potential or actual conflict of interest arising from her friendship with Miele to John.

283.    Indeed, no one at Rutgers disclosed the potential or actual conflict of interest arising out of the friendship between Miele and Maresca to John.

284.    In order to preserve her friendship with Miele, Maresca would be prone to affirming Title IX decisions and sanctions issued by Rutgers regardless of their validity.

285.    Maresca improperly affirmed the flawed Title IX decision and sanction issued against John.

286.    The appeal decision failed to properly consider John's arguments regarding O'Reilly's complete mishandling of the hearing and decision-making process.

287.    The appeal decision does not address the fact that O'Reilly prevented John from questioning Witness 2 about their relationship which occurred after Jane supposedly told Witness

2 about John's alleged behavior.

288.    The appeal decision does not address the fact that O'Reilly prevented John from introducing evidence that he ended the relationship with Witness 2.

289.    The appeal decision fails to adequately address John's argument that O'Reilly impermissibly allowed the post-hearing written statement prepared by Witness 4 to be entered into evidence despite the fact that John did not have the opportunity to cross-examine Witness 4 regarding the content of the written statement.

290.    The appeal decision misapplied the Rutgers Title IX Policy regarding the irrelevant nature of evidence related to John's mental and medical health.

291.    The Rutgers Title IX Policy clearly states that evidence and questions related to a Party's medical and psychological records are irrelevant unless the Party has given voluntary, written consent to be questioned on these issues.

292.    Here it is undisputed that John never gave voluntary, written consent to be questioned on these issues.

293.    To the extent that John offered testimony regarding his mental and medical health, that testimony was elicited when John was being questioned by Jane's advisor and should have been deemed irrelevant at the time of the hearing.

294.    The fact that O'Reilly improperly failed to prevent Jane's advisor from asking questions about John's medical and mental health, without the required voluntary written consent noted in the Title IX Policy, is conspicuously absent from the appeal decision.

295.    The appeal decision failed to address John's arguments regarding O'Reilly's minimization of Jane's credibility deficiencies.

296.    The appeal decision fails to offer any substantive reasoning as to why the sanction

issued was not disproportionate.

## FIRST CAUSE OF ACTION
### (VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972)

297.    John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

298.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

299.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

300.    Rutgers receives hundreds of millions of dollars in federal funding through grants and contracts.

301.    For example, during the 2021 fiscal year, Rutgers received more than $488,000,000 in federally funded grants and contracts.

302.    John and Jane were similarly situated male and female students in the circumstances of this case.

303.    Both were students at the same school, subject to the same Title IX policies.

304.    Both were reported to have committed sexual misconduct violations against each other.

305.    John provided evidence showing that Jane engaged in Stalking against him as defined by the Rutgers Title IX Policy.

306.    However, the evidence did not favor Rutgers' intended outcome, so they treated the same set of facts very differently for the male and female students.

307.   Despite the fact that Jane's repeated spreading of false rumors about John constituted Stalking as defined by the Rutgers Title IX Policy, the four Rutgers employees who were aware of her behavior and its impact on John utterly failed to comply with the requirements of the Rutgers Title IX Policy.

308.   Instead, multiple Rutgers faculty members engaged in retaliatory and inappropriate behavior against John.

309.   John also provided evidence that Jane engaged in Dating Violence against him.

310.   However, once again, the evidence did not favor Rutgers' intended outcome, so they treated the same set of facts very differently for the male and female students.

311.   Despite the fact that Jane's physical assault of John constituted Dating Violence as defined by the Rutgers Title IX Policy, the Rutgers employee who was aware of her behavior failed to comply with the requirements of the Rutgers Title IX Policy.

312.   Rutgers investigated Jane's Title IX allegations against John.

313.   Rutgers failed to investigate John's Title IX allegations against Jane.

314.   Rutgers enforced its Title IX policies and procedures against John.

315.   Rutgers did not enforce its Title IX policies and procedures against Jane.

316.   Rutgers dismissed  John's concerns of harassment by Jane but urged  Jane to formalize her allegations against John.

317.   Even though Jane explicitly stated that she did not want to initiate a Title IX process against John, Rutgers unilaterally decided to zealously investigate Jane's false allegations.

318.   During the investigation and adjudication of Jane's false claims, Rutgers construed all inconsistencies in Jane's favor.

319.   Numerous evidentiary and procedural errors throughout Rutgers' Title IX process

resulted in an erroneous outcome based on a distorted conception of the facts.

320. An erroneous outcome occurred in this case because John was innocent and wrongly found responsible for Stalking and Dating Violence, and gender bias was a motivating factor.

321. Evidentiary weakness and procedural flaws also support a claim of an erroneous outcome.

322. As detailed above, Rutgers misapplied its own policies and procedures when it found John responsible for Stalking.

323. Rutgers also failed to prove by a preponderance of the evidence that John engaged in Stalking.

324. Rutgers' finding that John was responsible for Stalking in contravention of its own policies and without sufficient evidence to support such a finding constituted an erroneous outcome.

325. As detailed above, Rutgers misapplied its own policies and procedures when it found John responsible for Dating Violence.

326. Rutgers also failed to prove by a preponderance of the evidence that John had engaged in Dating Violence.

327. Rutgers' finding that John was responsible for Dating Violence in contravention of its own policies and without sufficient evidence to support such a finding constituted an erroneous outcome.

328. Allegations of a flawed proceeding support a claim of an erroneous outcome.

329. Rutgers engaged in a flawed proceeding when it improperly denied John the opportunity to introduce exculpatory evidence.

330.    Rutgers engaged in a flawed proceeding when it allowed Jane to improperly introduce highly prejudicial evidence related to John's mental health and medical history.

331.    Rutgers engaged in a flawed proceeding when it improperly permitted one of Jane's witnesses to expand on her live testimony by providing a supplemental written statement that was not subject to cross-examination.

332.    Rutgers engaged in a flawed proceeding when it minimized inconsistent and false statements given by Jane while mischaracterizing the evidence and explanations John provided in response to the allegations against him.

333.    Rutgers engaged in a flawed proceeding when it failed to disclose conflicts of interest at the hearing and appeal stages of the adjudication of John's Title IX matter.

334.    Rutgers' actions were motivated by gender bias.

335.    Rutgers was under tremendous pressure to respond aggressively to allegations made by female accusers and over-correct by favoring the protection of female accusers at the expense of finding male respondents guilty after the United States Department of Education published its 2011 Dear Colleague Letter.

336.    Rutgers was also under significant internal pressure to exercise more vigilance against male respondents when it was investigating and adjudicating Jane's complaint against John.

337.    In the spring of 2018, Rutgers conducted a large-scale campus survey administered in conjunction with the Center on Violence Against Women and Children.

338.    Based on this survey data, the Rutgers Division of Student Affairs identified six key findings that were used to develop a comprehensive action plan on how to deal with sexual and dating violence at Rutgers.

339.    One of the key findings used to develop a comprehensive action plan on how to deal with sexual and dating violence at Rutgers was that men tended to commit the majority of acts of sexual and dating violence.

340.    Part of the comprehensive action plan included developing a Men's Engagement Working Group comprised of Student Affairs staff members to focus on engaging men on issues regarding men's mental health and interpersonal violence victimization and perpetration.

341.    Rutgers never developed a corresponding group to engage women on issues regarding their mental health and interpersonal violence victimization and perpetration.

342.    Part of the comprehensive action plan also included recognizing and supporting all survivor experiences for incoming students.

343.    In light of the finding that men tended to commit the majority of acts of sexual and dating violence, this part of the action plan meant that men who are accused of sexual and dating violence would be assumed to be guilty, as any "survivor" of such alleged misconduct would automatically be recognized and supported.

344.    Thus, Rutgers adopted a policy of bias favoring female students over male students.

345.    The atmosphere of anti-male bias at Rutgers is clearly seen in Jackel's August 3, 2021 Facebook post stating, "Believe Women.  Period."

346.    This Facebook post expressed Jackel's belief that a woman who accuses a man of sexual misconduct must be believed no matter what.

347.    This Facebook post also expressed Jackel's belief that men accused of sexual misconduct by women should be presumed guilty.

348.    In response to Jackel's Facebook post, Jones – a prominent Rutgers administrator and faculty member – stated, "Absolutely," indicating that he endorsed Jackel's beliefs that women

36

who accuse men of sexual misconduct must be believed no matter what and that a man accused of sexual misconduct should be presumed guilty.

349.    As detailed above, statements made and actions taken by multiple Rutgers professors in response to Jane's false claims further show that an atmosphere of anti-male bias existed on Rutgers' campus during the relevant time period.

350.    In light of the foregoing, Rutgers' behavior against John constituted illegal sex discrimination.

351.    As a direct and proximate result of the above conduct, John sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

352.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Rutgers as follows:

(i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

(ii)    awarding Plaintiff such other and further relief as the Court deems just, equitable, and proper.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

Dated: New York, New York
November 15, 2023

**WARSHAW BURSTEIN, LLP**
*Attorneys for Plaintiff*

By: /s/ Grant R. Cornehls
    Kimberly C. Lau (*pro hac vice* pending)
    Grant R. Cornehls (GC-6123)
    James E. Figliozzi (*pro hac vice* pending)
    575 Lexington Avenue
    New York, New York 10022
    (212) 984-7700
    klau@wbny.com
    gcornehls@wbny.com
    jfigliozzi@wbny.com

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I certify under penalty of perjury that the matter in controversy is not the subject of any

other action pending in any court or agency or any arbitration or administrative proceeding.

Dated: New York, New York
November 15, 2023

WARSHAW BURSTEIN, LLP
*Attorneys for Plaintiff*

By: /s/ Grant R. Cornehls
Kimberly C. Lau (*pro hac vice* pending)
Grant R. Cornehls (GC-6123)
James E. Figliozzi (*pro hac vice* pending)
575 Lexington Avenue
New York, New York 10022
(212) 984-7700
klau@wbny.com
gcornehls@wbny.com
jfigliozzi@wbny.com

<u>**STATEMENT PURSUANT TO LOCAL CIVIL RULE 10.1**</u>

Plaintiff's address cannot be provided as a part of this pleading because doing so would

reveal Plaintiff's true identity and undermine his pending request to proceed using a pseudonym.

Dated: New York, New York
      November 15, 2023

        **WARSHAW BURSTEIN, LLP**
        *Attorneys for Plaintiff*

      By: <u>/s/ Grant R. Cornehls</u>
          Kimberly C. Lau (*pro hac vice* pending)
          Grant R. Cornehls (GC-6123)
          James E. Figliozzi (*pro hac vice* pending)
          575 Lexington Avenue
          New York, New York 10022
          (212) 984-7700
          klau@wbny.com
          gcornehls@wbny.com
          jfigliozzi@wbny.com